Jesse G. Wellons v. Commissioner.
Jesse G. Wellons v. Commissioner
Docket No. 34677.
United States Tax Court
1952 Tax Ct. Memo LEXIS 108; 11 T.C.M. (CCH) 875; T.C.M. (RIA) 52254; August 19, 1952
*108 C. B. Kniskern, Jr., Esq., 211 Roper Bldg., Miami, Fla., for the petitioner. James R. Harper, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner de termined the following deficiencies in taxpayer's income tax: Year
Deficiency
1945
$ 2,964.43
1946
12,861.94
1947
27,921.30
The deficiency for 1945 is not in dispute. The other deficiencies are contested. Certain adjustments are conceded, however, and the sole issue is whether taxpayer is taxable on his wife's 20 per cent of the income from an enterprise known as the Rainbo Club; in other words, whether taxpayer's wife, Frances, was a bona fide partner in Rainbo Club. This proceeding was heard April 21, 1952 at Miami, Florida. The issue was primarily one of fact and at the conclusion of the hearing, after consideration of the stipulated facts and the testimony adduced, the Court granted taxpayer's motion for judgment in his favor. Taxpayer was given 60 days to submit proposed findings of fact and the Commissioner was given time to make his comments thereon. The taxpayer has complied with the Court's directions. The Commissioner has *109 filed no comments on or objections to the proposed findings. The stipulated facts are found accordingly. Findings of Fact Taxpayer is an individual residing in Hollywood, Florida, and filed his income tax returns for the calendar years 1946 and 1947 with the collector of internal revenue for the district of Florida. During the latter part of April 1945 the taxpayer, together with his wife Frances C. Wellons, his brother M. B. Wellons, and one R. A. Springer, who was unrelated to the others, met in the Rainbo Grill in Hollywood, Florida, for the purpose of organizing a partnership to conduct a gambling business, which would be known as the Rainbo Club, in the City of Hollywood, Florida. At that meeting the taxpayer asked the others what interests they wanted in the business and each of the others requested a 20 per cent interest. The taxpayer consented to take the remaining 40 per cent interest and it was agreed that the profits or losses of the business would be shared by the partners in proportion to those percentages. Inasmuch as Springer was the only partner possessing experience in the actual operation of a gambling business and since the other partners would be unable *110 to devote their time to the business, it was agreed that Springer would manage the business and that no services would be rendered by the other partners. It was understood that Springer would be paid a salary above his share of partnership profits for his managerial services when and if the business warranted it. The amount of his salary was left up to Springer to determine. During the fiscal year of the partnership ended May 31, 1946 he paid himself a salary of $1,815, and during the next fiscal year he paid himself a salary of $5,100. The partnership agreement, which was oral, provided that the partnership would start operations with a cash "bankroll" of $4,000 and that each partner would put up his or her share of the "bankroll". The amount of $4,000 was suggested by Springer. The $4,000 agreed upon was immediately put up in cash, with the taxpayer contributing $1,600 and each of the other partners, $800. The contribution of Frances was made by her from her separately owned funds. It was not intended originally that the $4,000 "bankroll" would be deposited in a bank, but due to the fact that difficulties in getting racing wire service delayed the opening of the business, Springer *111 deposited the money in a bank account on which he and M. B. Wellons had the right to draw checks. Subsequently the taxpayer, who spent most of his time traveling in Fayetteville, North Carolina, had a chance meeting with Springer in the bank at Hollywood. Springer suggested that taxpayer sign the signature card on the partnership account in order to be able to sign checks on that account. Taxpayer signed the card, but he never exercised his right to sign checks on this account. It was intended that Frances, who spent most of her time in Fayetteville, North Carolina, should also sign the signature card, but she never did so. When the business began operations on May 28, 1945, Springer withdrew $1,875 from the bank. To that sum was added $625 in cash, which was contributed by one Forrest Smith whom the partners had, subsequent to their meeting in April, agreed to admit as a fifth partner. The total sum of $2,500 was used by Springer as the cash "bankroll" with which the partnership began its operations. Forrest Smith was admitted to the partnership because of his experience in gambling operations, and it was understood that he would render services to the partnership. It was agreed *112 by all the partners that Smith would receive a salary of $20 per day plus 25 per cent of the profits and that he would bear 25 per cent of the losses. It was further agreed that the remaining 75 per cent of profits or losses would be shared by the original partners in proportion to their original percentages. Smith became dissatisfied after approximately one week of operation because he did not think that the business was going to make money. Springer refunded his $625 and Smith withdrew from the partnership. It was agreed by the partners that the business would be operated in a room located over the Rainbo Grill. The building was owned by taxpayer; however, it was occupied by Springer under a written lease executed in 1942 and Springer paid rental to taxpayer for the entire building. No rental under its sub-tenancy was paid by the Rainbo Club to Springer during the fiscal year ended May 31, 1946. However, during the fiscal year ended May 31, 1947, Springer caused the Rainbo Club to pay him rental in the amount of $1,800. This figure was determined solely by Springer without consulting the other partners and was based upon a monthly rate of $200 for the nine months of that year that *113 the partnership was in operation. Springer caused a portion of this rental to be paid directly to taxpayer to apply on Springer's obligation to taxpayer for rentals on the entire building. During the fiscal year ended May 31, 1947, the partnership maintained a second gambling room in another building owned by taxpayer. By agreement of all the partners, the partnership paid taxpayer the sum of $2,000 as rental for its use of that room during that fiscal year. It was understood by all of the partners that with the exception of Springer the principal contribution of the partners to the enterprise was their undertaking to bear, in proportion to their interests, any losses which might be realized. It was for this reason that M. B. Wellons, Springer, and Frances did not want more than a 20 per cent interest each. Had they wanted larger shares, they could have had them. At the time the partnership was formed, Frances had a net worth of approximately $50,000 and her net worth thereafter generally increased. She understood that should the partnership incur losses which exhausted the original capital she would be required to put up additional money proportionately with the other partners. *114 The business was in fact managed by Springer and the other partners rendered no services. When matters of major importance arose, such as the admission of Smith to the partnership, they were discussed and the decisions thereon were made by all the partners. Springer periodically distributed profits of the partnership by checks made out to each partner. Springer alone determined when to distribute profits and the amount of each distribution. All distributions were made in proportion to the partnership interests of the partners, and Frances deposited her share of each distribution in her individual checking account. Thereafter she had full dominion and control over her share of the profits and used them as she saw fit. Some of her profits were loaned by her to taxpayer but such loans were fully repaid by June 14, 1948 and thereafter taxpayer loaned money to her. Frances also used a substantial portion of her profits to invest in new business enterprises. The taxpayer and Frances customarily associated themselves as partners in business enterprises. This course of dealing began no later than 1943 and had continued up to the time of the hearing in this proceeding. At the time of *115 the hearing taxpayer and Frances had been associated as partners in at least eight partnerships other than the Rainbo Club and had equally owned the stock of one corporation. The Commissioner has recognized the validity of many of these partnerships. These ventures included a sandwich shop, a diner, two theatres, a cab company, a mortgage company, a boat sales company, a tobacco warehouse, and a business known as Army-Navy Wholesale Supply. None of these partnerships except the sandwich shop had a written partnership agreement. The taxpayer believed it was good business practice to associate his wife with him in business ventures because he felt that her conservatism counterbalanced his tendency to be a "plunger". At least three employees of the Rainbo Club knew that Frances was a partner in that business during the period here involved. A fourth employee knew that there were four partners but he was not advised as to their identities. Randall, the accountant, was advised by Springer in June of 1945 as to the existence of the partnership and the identities of the partners. In 1947 or 1948, M. B. Wellons was approached by a hotel operator who wished to buy into the Rainbo Club business. *116 M. B. at that time advised this individual that the business was a partnership, stated who the partners were, and the extent of their several interests. Taxpayer Jesse G. Wellons, M. B. Wellons, Springer, and Frances Wellons in good faith agreed to and did become partners in the operation of the business known as the Rainbo Club for its fiscal years ended May 31, 1946 and May 31, 1947. Taxpayer's interest in the profits of that business was 40 per cent thereof, and Commissioner erred in attempting to tax to taxpayer 60 per cent of those profits. Opinion Our findings of fact are fully and adequately supported by the stipulation of the parties and the testimony and other evidence admitted at the hearing. We have given detailed study to the record and in the light of the principles set forth in , and , we have concluded that taxpayer's wife was a bona fide partner in the enterprise known as Rainbo Club in the indicated proportion. Accordingly, taxpayer is not taxable on more than 40 per cent of the profits of Rainbo Club, and we so hold. Decision will be entered under Rule 50. *117